3:24-cv-02266-JD

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO

| | |
|---|---|
| In re:<br><br>San Benito Health Care District dba Hazel Hawkins Memorial Hospital,<br><br>Debtor. | On Appeal from<br>the United States Bankruptcy Court<br>for the Northern District of California<br><br>Bankruptcy Court Case No.:<br>23-50544 SLJ<br>Chapter 9 |
| San Benito Health Care District dba Hazel Hawkins Memorial Hospital,<br><br>Appellant,<br><br>v.<br><br>California Nurses Association & National Union of Healthcare Workers,<br><br>Appellees. | Judge:      Hon. James Donato<br>Courtroom: 11<br>Location:   450 Golden Gate Avenue<br>            San Francisco, CA 94102 |

## APPELLANT'S OPENING BRIEF

MICHAEL A. SWEET (SBN 184345)
msweet@foxrothschild.com
JACK PRAETZELLIS (SBN 267765)
jpraetzellis@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436

*Counsel for Appellant, the San Benito Health Care District dba Hazel Hawkins Memorial Hospital*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellant, San Benito Health Care District dba Hazel Hawkins Memorial Hospital, hereby discloses that it is a California health care district organized and operated, pursuant to §§ 32000 *et seq.* of the California Health and Safety Code, and that it has no parent corporation and has no shareholders.  Therefore, no entity owns or controls ten percent or more of its shares.

# **TABLE OF CONTENTS**

Introduction .................................................................................................1

Jurisdictional Statement ............................................................................4

Issues on Appeal.........................................................................................5

Statement of Facts and Procedural History...............................................7

    A.    The Parties ................................................................................7

    B.    The District Is the Sole Comprehensive Health System in the County and Has Struggled with Chronic Financial Challenges...........8

    C.    A Late-2022 Fiscal Emergency Renders the District With Too Little Cash on Hand to Justify a Bankruptcy Filing............................10

    D.    The Short-Term Cash Management Initiatives Had Downsides— the District Advanced Cash Receipts from Future Periods and Did Not Pay Certain Significant Obligations.............................................12

    E.    The Development of the District's Cash Flow Projections and Pendency Plan. ...................................................................................14

    F.    The District's Financial State and Outlook on the Petition Date. .......16

    G.    The Eligibility Order ..........................................................................18

Summary of Argument...............................................................................19

Argument....................................................................................................23

    A.    The Bankruptcy Court Erred as a Matter of Law in Excluding the District's Largest Due and Unpaid Petition Date Obligation—the Annual Pension Funding Obligation—from Both Insolvency Analyses. ............................................................................................23

        1.    California's Vested Rights Doctrine Recognizes a Constitutional Right to Annual Pension Funding That Renders the Pension "Actuarially Sound." ...............................24

        2.    California Recognizes a Separate Constitutional Fiduciary Duty to Appropriately Fund a Pension. ....................................29

ii

3.     The Eligibility Order, Which Addresses Whether the Entirety of an Unfunded Actuarially Accrued Liability Is Due, Misstates the Relevance of Actuarial Determinations. ....31

B.     Current Insolvency under § 101(32)(C)(i). .........................................36

1.     The District Did Not Waive Its Right to Argue That It Was Currently Insolvent. .................................................................36

2.     The Omission of the Annual Pension Funding Obligation from the Totality of the Circumstances Test Is Not Harmless Error Where the Debt Is Material. ..............................................38

C.     Prospective Insolvency under § 101(32)(C)(ii). ...............................41

1.     The Bankruptcy Court's Reliance on Accrual-Based Historical Financial Data to Contradict Cash Projections Is Inconsistent with the Legal Standard for Insolvency under § 101(32)(C)(ii) and the Applicable Burden of Proof. ...............41

2.     The Bankruptcy Court Narrowly Limited Its Analysis to the District's Financial Projections and Misconstrued the District's Expert Evidence. ........................................................48

D.     The Bankruptcy Court's Misplaced Reliance on CNA's Expert Witness and Erroneous Admission of Testimony as Expert Testimony. .........................................................................................52

1.     The Expert's Conclusion That Accrual Based Reporting "Is More Reliable" Than Cash Forecasting Contradicts the Legal Standard Applicable to Chapter 9 Insolvency.................52

2.     The CNA Expert Ignored Available Evidence of the District's Bank Account Balances, in Favor of Accrual Based Monthly GAAP Reporting, to Sew Doubt About the District's Cash Projections.......................................................54

Conclusion .............................................................................................................55

160689364.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alameda Cty. Deputy Sheriff's Ass'n v. Alameda Cty. Emps.' Ret.*
*Ass'n*, 9 Cal. 5th 1032, 1076 (Cal. 2020) ....................................................24, 25

*Barnhill v. Johnson*,
503 U.S. 393 (1992)..................................................................................6

*Bd. of Admin. v. Wilson*,
52 Cal. App. 4th 1109 (Cal. Ct. App. 1997)................................................27, 28

*In re Brace*,
979 F.3d 1228 (9th Cir. 2020) .....................................................................6

*Brandt v. Bd. of Ret.*,
136 Cal. App. 4th 140 (Cal. Ct. App. 2006)........................................................31

*Cal Fire Local 2881 v. Cal. Pub. Emps.' Ret. Sys.*,
6 Cal. 5th 965, 977 (2019) .........................................................................24

*Carman v. Alvord*,
31 Cal. 3d 318 (1982) ...............................................................................32

*In re City of Bridgeport*,
129 B.R. 332 (Bankr. D. Conn. 1991)..........................................................4, 41

*In re City of Chester*,
649 B.R. 633 (Bankr. E.D. Pa. 2023) .....................................................34, 35, 40

*In re City of Detroit, Mich.*,
504 B.R. 191 (Bankr. E.D. Mich. 2013)......................................................*passim*

*In re City of Stockton, Cal.*,
475 B.R. 720 (Bankr. E.D. Cal. 2012)............................................................41

*In re City of Stockton, Cal.*,
493 B.R. 772 (Bankr. E.D. Cal. 2013)........................................................*passim*

*In re City of Stockton, Cal.*,
526 B.R. 35 (Bankr. E.D. Cal. 2015)..............................................................25

160689364.1

*In re City of Vallejo,*
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ............................................................4, 42

*Cty. of Orange v. Ass'n of Orange Cty. Deputy Sheriffs,*
    192 Cal. App. 4th 21 (Cal. Ct. App. 2011)........................................................32

*U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at*
    *Lakeridge, LLC,*
    138 S. Ct. 960 (2018)..........................................................................................7

*Fed. Trade Comm'n v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ............................................................................5, 6

*Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media),*
    378 F.3d 916 (9th Cir. 2004) ..............................................................................39

*In re Hamilton Creek Metro. Dist.,*
    143 F.3d 1381 (10th Cir. 1998) ....................................................................23, 28

*Highland Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...............................................................54

*Imperial Cty. Sheriff's Ass'n v. Cty. of Imperial,*
    87 Cal. App. 5th 898 (Cal. Ct. App. 2023)....................................................33, 34

*In re Kaypro,*
    218 F.3d 1070 (9th Cir. 2000) ...........................................................................42

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)............................................................................................7

*Kummetz v. Tech Mold, Inc.,*
    152 F.3d 1153 (9th Cir. 1998) .............................................................................6

*LinkCo., Inc. v. Fujitsu Ltd.,*
    No. 00-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ..............................55

*Lopez v. Catalina Channel Express, Inc.,*
    974 F.3d 1030 (9th Cir. 2020) .............................................................................7

*In re Marciano,*
    446 B.R. 407 (Bankr. C.D. Cal 2010), *aff'd*, 459 B.R. 27 (B.A.P.
    9th Cir. 2011).....................................................................................................39

v

*Marin Ass'n of Pub. Emps. v. Marin Cty. Emps. Ret. Ass'n*,
2 Cal. App. 5th 674 (Cal. Ct. App. 2016) ........................................................... 25

*Mid-Del Therapeutic Ctr., Inc. v. C.I.R.*,
30 Fed. Appx. 889 (10th Cir. 2002) (unpublished) ........................................... 46

*Mijares v. Orange Cty. Emps. Ret. Sys.*,
32 Cal. App. 5th 316 (Cal. Ct. App. 2019) ................................................... 32, 33

*Miller v. California*,
18 Cal. 3d 808 (1977) ......................................................................................... 25

*Munro v. Univ. of S. California*,
2022 WL 16955481 (C.D. Cal. Nov. 1, 2022) .................................................... 52

*In re Novatel Wireless Sec. Litig.*,
846 F.Supp.2d 1104 (S.D. Cal. 2012) ................................................................. 52

*O'Neal v. Stanislaus Cty. Emps.' Ret. Ass'n*,
8 Cal. App. 5th 1184, 1208 (Cal. Ct. App. 2017) .............................................. 29

*Olin Corp. v. Lamorak Ins. Co.*,
2018 WL 1901634 (S.D.N.Y. Apr. 17, 2018) ..................................................... 52

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001) ................................................................................ 6

*Ralston Dev. Corp. v. U.S.*,
937 F.2d 510 (10th Cir. 1991) ............................................................................. 46

*In re Sierra Steel, Inc.*,
96 B.R. 275 (B.A.P. 9th Cir. 1989) ..................................................................... 42

*Suzy's Zoo v. Comm'r*,
273 F.3d 875 (9th Cir. 2001) ................................................................................ 7

*United States Gypsum Co. v. Lafarge North America, Inc.*,
670 F.Supp.2d 737 (N.D. Ill. 2009) .................................................................... 52

*United States v. Jose*,
131 F.3d 1325 (9th Cir. 1997) .............................................................................. 6

*United States v. Olano,*
    507 U.S. 725 (1993).........................................................................37

*United States v. Suddarth,*
    795 Fed. Appx. 337 (6th Cir. 2019)................................................46

*Valdes v. Cory,*
    139 Cal. App. 3d 773 (Cal. Ct. App. 1983).........................26, 27, 28

*In re Villages at Castle Rock Metro. Dist. No. 4,*
    145 B.R. 76 (Bankr. D. Colo. 1990)........................................42, 53

*White v. Ford Motor Co.,*
    312 F.3d 998 (9th Cir. 2002) .............................................................7

**Statutes**

11 U.S.C. § 101(32)(C) ..........................................................*passim*

11 U.S.C. § 101(32)(C)(i) .......................................................*passim*

11 U.S.C. § 101(32)(C)(ii) ......................................................*passim*

11 U.S.C. § 109(c)(3).............................................................18, 19

11 U.S.C. § 921(c) .......................................................................19

28 U.S.C. § 157(a) and (b)..............................................................5

28 U.S.C. § 158(a) ..........................................................................5

28 U.S.C. §§ 1334(a) .......................................................................5

Cal. Health & Saf. Code §§ 32000 *et seq.*......................................7, 8

**Other Authorities**

U.S. Const. ............................................................25, 26, 28

Cal. Const. ...........................................................25, 26, 28, 29

Cal. Const., Art. XVI, § 17.......................................................29, 30

Fed. R. Bankr. P. 8002(a)(1) ...............................................................5

160689364.1

FED. R. BANKR. P. 8003(a)(4) ................................................................................5

FED. R. BANKR. P. 8014(a) ....................................................................................1

160689364.1

Appellant, the San Benito Health Care District dba Hazel Hawkins Memorial Hospital (the "<u>District</u>" or the "<u>Debtor</u>"), the debtor in the above-referenced bankruptcy case (the "<u>Bankruptcy Case</u>") filed under chapter 9 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")[1] before the United States Bankruptcy Court for the Northern District of California (the "<u>Bankruptcy Court</u>"), hereby submits this *Appellant's Opening Brief* (the "<u>Brief</u>"), pursuant to Rule 8014(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## <u>INTRODUCTION</u>

The central issue in this appeal is the extent to which the Bankruptcy Code requires a distressed municipal debtor to be out of cash on, or soon after, the Petition Date. The Bankruptcy Court dismissed the District's Bankruptcy Case based on an unduly narrow view of the chapter 9 insolvency tests while excluding the District's pension obligations from the analysis.

The issue is of critical importance to the District and other municipal health care providers that must balance the desire to remain open with the obligation to ensure any winddown is initiated with sufficient funds to protect patient care. The District operates a 25-bed, critical access, acute-care hospital—the only hospital in

---

[1] Unless otherwise defined herein, all references to "Section" and "§" refer to a section of the Bankruptcy Code.

the county and the only provider of crucial services such as emergency and labor and delivery. The District also operates two skilled nursing facilities licensed for 119 beds that serve long-term, low income, and difficult to transfer patients. It is also offers primary and specialty care services at eight clinics throughout the county. Transitioning patients and preserving medical records in the event of a closure is both costly ($5 million) and time consuming (six months). If the Bankruptcy Code requires the District to be out of cash before filing its bankruptcy petition, eligible municipal healthcare providers would have to put public health and safety at risk before taking advantage of the protections of the Bankruptcy Code.

The Bankruptcy Court held that the District did not satisfy the insolvency standard, in part, by ignoring the annual pension contribution, between $3 million and $4.05 million, that the District had not funded as of the Petition Date. The Bankruptcy Court found that "the District has no legal obligation to pay the actuarially determined contributions [to its pension plan], which are neither presently, unconditionally owing, nor presently enforceable." This holding is at odds with California's well-established vested rights doctrine and fiduciary obligations that require annual funding of pensions to satisfy the pensions long-term, unfunded actuarially accrued liabilities. Indeed, the Bankruptcy Court's ruling departs from other chapter 9 eligibility holdings that specifically find these obligations "due and owing" for purposes of the insolvency analysis. To hold otherwise would require that

2

a pension be brought to failure—and retirees begin missing benefits payments—before the obligation is considered a "debt." It finds no support in case law and constitutes legal error. The omission of this significant debt from the Bankruptcy Court's insolvency analyses requires, at minimum, remand for further findings concerning the impact of the debt on the District's insolvency.

With respect to the two alternative insolvency definitions applicable to municipalities—current insolvency on the petition date or prospective insolvency—the Bankruptcy Court adopted exacting standards that exceed the applicable standard of proof and case law. The Bankruptcy Court erroneously held that the District waived any argument it was currently insolvent by admitting it could pay *some* vendors even though it did so by not satisfying other obligations. The Bankruptcy Court also effectively required that the District's cash forecasts, which were utilized to project the date the District would run out of cash, should match with the District's accrual-based, historical financial reporting despite the two accounting methodologies speaking "different languages." The Bankruptcy Court eschewed reference to evidence that was not in the form of a financial statement, and never squared the acknowledged fact that the District was down to just 1.5 days of cash on hand six months before the bankruptcy filing. While pinpoint accuracy and certainty of historical financial reporting is always preferable, it is not realistic or required by the applicable legal standards that "implicates the notions of time and projections

3

about the future." *In re City of Stockton, Cal.*, 493 B.R. 772, 788 (Bankr. E.D. Cal. 2013).

A municipality need not (and should not) bring itself to the brink of financial calamity before being eligible for bankruptcy relief.  It is not required to take "actions [that] defied fiscal prudence" to stave-off insolvency where "raiding funds for short-term needs would simply cripple [the municipality] more." *In re City of Vallejo*, 408 B.R. 280, 293 (B.A.P. 9th Cir. 2009). Indeed, municipalities "cannot go out of business. Chapter 9 is intended to enable a financially distressed [municipality] to 'continue to provide its residents with essential services.'" *In re City of Bridgeport*, 129 B.R. 332, 336-337 (Bankr. D. Conn. 1991) (quoting H.R.Rep. No. 1011, 100th Cong., 2d Sess. 2 (1988), U.S.Code Cong. & Admin. News 1988, pp. 4115, 4116).

For the reasons set forth more fully herein, the District submits that the Eligibility Order must be reversed and the matter remanded either for further proceedings or for factual findings consistent with the appropriate legal standards applicable to insolvent municipal debtors.

## JURISDICTIONAL STATEMENT

This is an appeal from the Bankruptcy Court's final order (the "Eligibility Order") finding that the District was not eligible to be a debtor, under §§ 109(c) and

921(c) and dismissing the Bankruptcy Case. A00746.[2] The Bankruptcy Court's order overruling the District's objection to CNA's expert testimony (the "Hurley Order") merged with the final Eligibility Order. *See*  FED. R. BANKR. P. 8003(a)(4); A00708. This appeal is timely because the notice of appeal was filed on April 4, 2024, which is fourteen days after the Bankruptcy Court entered the Eligibility Order on March 21, 2024. *Compare id. with* A00760; *see also* FED. R. BANKR. P. 8002(a)(1).

The Bankruptcy Court has subject-matter jurisdiction concerning the District's eligibility to be a debtor, pursuant to 28 U.S.C. §§ 1334(a), by reference from this Court, under 28 U.S.C. § 157(a) and (b) and this Court's *General Order No. 24*.

This Court has jurisdiction to hear appeals from final orders of the Bankruptcy Court, pursuant to 28 U.S.C. § 158(a).

## <u>ISSUES ON APPEAL</u>

1.     Whether the Bankruptcy Court erred in holding that "the District has no legal obligation to pay the actuarially determined contributions [to its pension plan], which are neither presently, unconditionally owing, nor presently enforceable" under California law for purposes of assessing insolvency under § 101(32)(C). A00783. Conclusions of law are reviewed *de novo*. *See, e.g.*, *Fed. Trade Comm'n v.*

---

[2] All references to "A" followed by a number refer to a page, or pages, of the *Appendix in Support of Appellant's Opening Brief* filed concurrently herewith.

*Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020); *In re Brace*, 979 F.3d 1228, 1232 (9th Cir. 2020).

2.      Whether the District waived its right to argue that it was insolvent, under § 101(32)(C)(i), when it held sufficient cash to maintain operations by not paying other obligations that were due and owing. Waiver of a legal argument is a question of law reviewed *de novo*. *See, e.g.*, *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001); *Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1154 (9th Cir. 1998).

3.      Whether the Bankruptcy Court erred in holding that the totality of the circumstances did not establish that the District was insolvent, under § 101(32)(C)(i), when it omitted the District's pension funding liability from the analysis. Conclusions of law are reviewed *de novo*. *See, e.g.*, *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020); *In re Brace*, 979 F.3d 1228, 1232 (9th Cir. 2020).

4.      Whether the Bankruptcy Court correctly construed the scope of the prospective insolvency definition, under § 101(32)(C)(ii). Questions of statutory interpretation are reviewed *de novo*. *United States v. Jose*, 131 F.3d 1325, 1327 (9th Cir. 1997) (*en banc*); *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992) (whether facts satisfy the statutory definition of a transfer, under § 101, is a question of law).

160689364.1

5.      Whether the Bankruptcy Court erred in its application of historical facts to the prospective insolvency definition, under § 101(32)(C)(ii). Mixed questions of law and fact involving undisputed primary facts and disputed inferences and legal consequences are reviewed *de novo*. *See Suzy's Zoo v. Comm'r*, 273 F.3d 875, 878 (9th Cir. 2001); *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

6.      Whether the Bankruptcy Court correctly applied the preponderance of evidence standard applicable to insolvency determinations under § 101(32)(C). Improper allocation of the burden of proof is reviewed *de novo*. *See Lopez v. Catalina Channel Express, Inc*., 974 F.3d 1030, 1033 (9th Cir. 2020).

7.      Whether the Bankruptcy Court abused its discretion in admitting the testimony of the California Nurses Association's ("CNA") expert witness. Evidentiary rulings on the admission of expert testimony are reviewed for abuse of discretion. *See White v. Ford Motor Co*., 312 F.3d 998, 1006 (9th Cir. 2002); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.      The Parties

The Appellant, the District, is a California health care district organized and operated, pursuant to §§ 32000 *et seq.* of the California Health and Safety Code. A00819 (Tr., at 21:13-15); *see also* A00019.

7

The Appellees, CNA and the National Union of Healthcare Workers ("NUHW"), are California labor unions that represent certain employees of the District under memoranda of understanding with the District. A00895-896.

## B.     The District Is the Sole Comprehensive Health System in the County and Has Struggled with Chronic Financial Challenges.

The District is the only health care service provider of its magnitude and one of the largest employers in San Benito County, California (the "County"). A00819-20, A00823. The District operates a 25-bed, critical access, acute-care hospital that provides emergency, intensive care, medical-surgery, mother-baby, radiology and laboratory services. A00820. The District operates two skilled nursing facilities licensed for 119 beds that serve a majority long-term, Medi-Cal residents. *Id.*, A00823. The District also operates eight clinics—six are rural health clinics—that receive approximately 55,000 patient appointments per year. A00820. The District's hospital is the only facility in the County to provide emergency, intensive or surgical care and the only facility at which mothers can deliver a baby in the County. A00821. The District's skilled nursing facilities provide the only long-term nursing care in the County. *Id*. The next nearest hospital is 30 minutes to an hour away and long-term nursing care alternatives are scant. A00824.

The District has long struggled to maintain its financial footing. The District became a critical access hospital in March 2020 in an effort to access increased

Medicare reimbursement rates of up to 99% of the cost of care. A01218-19. The designation required the District to reduce its bed-count to 25—lower than its then-recent average census—just as COVID-19 surged its daily patient census up to 44. A01218, A01220. The COVID surge resulted in increased government funding for the District, but the District was required to repay some of these funding sources. A01219. The surge in patient population required the District to turn to registry staffing options that came with a premium of three to four times the regular cost of an employee. A01220. On balance, the District's costs to respond to COVID—labor, PPE, ventilators, and other equipment—plus the loss of elective procedure revenue resulted in a net cash flow losses. A01220-21. Moreover, as a smaller health system, the District lacked the economies of scale to negotiate competitive reimbursement rates with commercial payors and has no ability to negotiate with government payors like Medicare and Medi-Cal. A01222.

In early 2022, the District solicited a report from an outside consultant—ADAMS—to address strategic planning approaches. A00834. The ADAMS report concluded that the District needed to expand service offerings to remain competitive; the District was losing market share to larger systems outside of the County. A00837. ADAMS presented three alternative scenarios to exit critical access designation, increase patient volumes and services, and expand the District's facilities—each of which would cost hundreds of millions in capital expenses. A00839-40.

Additionally, the District is burdened with employee benefit obligations that are more expensive than comparable systems, including a defined benefit pension and a self-insured health plan that costs the District $15 million per year. A00838-39. The District adopted building a new hospital as part of its strategic plan at a meeting in October 2022. A00848.

**C.      A Late-2022 Fiscal Emergency Renders the District With Too Little Cash on Hand to Justify a Bankruptcy Filing.**

A series of compounding financial crises had placed enormous strain on the District's cash flow beginning mid-2022. In June 2022, Medicare gave the District notice of a recoupment liability of $5.2 million to be repaid within 12 months and a concurrent reduction going forward of about $5.2 million in reimbursements. A01201, A01205. The District had a $1.1 million payment of the employer portion of payroll taxes—deferred under the CARES Act—that became due in December 2022. A01201-02. Additionally, the District experienced lower patient volumes for five months after going out-of-network with its largest commercial payor due to stalled contract negotiations in July 2022. A01207. The District was also grappling with high inflation and the continued fallout from COVID-19 expenses. A01201-02. Similarly, the District was unable to keep-up with two liabilities related to its defined benefit plan: (i) the District had not been satisfying its contractual obligation to fund the pension benefit annually (in an amount ranging between $3 million and $4.05

10

million) under its collective bargaining agreements; and (ii) the District had no ability to fund the actuarially-determined, long-term funding shortfall under the plan estimated to be approximately $14.7 million driven (in part) by past annual underfunding. A01209, A01216-17, A01223.

By late October 2022, the District projected that by mid-December 2022, it would hold just 1.4 days of cash on hand—determined by dividing the then-current daily operating expense of the District by its cash on hand. A00853-54, A00856. The projections further reflected that the District would be unable to fund the last payroll in December 2022. *Id*.

On November 4, 2022, the District declared a fiscal emergency that would have permitted an immediate bankruptcy filing but then determined that bankruptcy was infeasible for two reasons. A00767, A00854, A00859. ***First***, the District concluded it could not propose a feasible plan given insufficient cash on hand at the time. A00859-60, A01056-57. ***Second***, the District considered the catastrophic impact a rapid closure of services would have on the community and patients, particularly the District's long-term care patients. A01075-76. The District's closure analysis concluded that a responsible closure and transfer of care (and patient records) would take at least six months and cost approximately $5 million. A01073-75. The District was forced to develop an alternative strategy to stabilize operations

after concluding that its limited cash could not be used to fund a bankruptcy case without jeopardizing patient care.

**D.** **The Short-Term Cash Management Initiatives Had Downsides—the District Advanced Cash Receipts from Future Periods and Did Not Pay Certain Significant Obligations.**

The District turned its attention to short-term stabilization initiatives to preserve cash. These stabilization initiatives included stringent cash management protocols where the District slow-paid vendors in breach of contract terms, did not pay the $1.1 million IRS tax obligation due in December 2022, and did not make the actuarially-determined, annual funding obligations to its defined benefit plan. A01202, A01210. The District advanced revenue from future periods, including taking advances on property tax revenue, and obtaining additional short-term secured financing from a state program. A00860-64, A01063. To free-up cash, the District also sold real estate it owed, froze hiring, and closed its home health service line. *Id*. The short-term stabilization efforts slowly pushed the projected date the District would run out of cash from December 2022, to February 2023, and then to April 2023. A01052, A01055, A01076. Despite the temporary success of the short-term initiatives, the District concluded that the cash flow benefits were not a sustainable long-term solution because they relied on nonpayment of obligations and

payment advances that necessarily resulted in a concomitant decrease in future projected revenue.

The District had to either increase revenue or decrease expenses to achieve long-term stability—objectives the District could not achieve with its chronic challenges. A01079-80. ***First***, the District concluded it could not increase revenue because, as a 25-bed critical access hospital, the District did not generate sufficient patient volume. A01080. ADAMS, the previously-mentioned third-party consultant concluded that the District would need to shed the critical access hospital designation (and related 25-bed limitation), expand the District's facilities and services, and increase patient volumes to remain competitive. A00837, A00839-43. However, the capital expenses associated with these proposals presented by the consultant—each in the hundreds of millions of dollars—far exceeded the District's financial ability. *Id*. ***Second***, the District concluded that it could not materially decrease long-term expense obligations.  The District performed a study that concluded its employee benefits—including its defined benefit plan and self-insured health plan that cost $15 million per year—were materially more expensive than comparable systems. A00838-39. Salaries, wages, and benefits represented approximately 70% of the District's annual expenses. A01080. But, the District was prohibited from modifying these expenses under collective bargaining agreements. *Id*. The District had

13

stretched the short-term initiatives as far as possible and required a long-term approach to stabilize operations before running out of cash once again.

E.   **The Development of the District's Cash Flow Projections and Pendency Plan.**

As it struggled to stay afloat through its fiscal crisis, the District utilized two teams of financial professionals, each for separate purposes.   ***First***, the District employed its regular finance department, headed by the District's chief financial officer, for the District's ordinary course financial reporting, compliance, and operations. A01201. ***Second***, in November 2022, the District engaged an outside financial consultant to provide restructuring financial advisory services, including cash flow forecasting. A01055. As a result of their different purposes, the work product of these teams did not "speak the same language." A01054-55. The District's finance department focused on backward-looking historical reporting under Generally Accepted Accounting Principles ("GAAP"), whereas the financial advisor focused on developing forward-looking projections based on cash accounting. *Id.*

The District's financial advisor was tasked with cash management efforts including implementing cash management controls and developing a cash forecast to tightly monitor cash availability. The financial advisor prepared weekly updated cash flow projections that represented a "rolling work product"—the projections were "started in November of 2022 and then updated weekly throughout the

pendency of the case." A01131. The original projections were premised on the District's actual performance from August 2022 through October 2022. A01141. The historical performance data was comprised of the District's bank data, which was imported to a financial model and adjusted for the District's projected schedule and estimates for supplemental revenue receipts. A01053-54. The cash flow projections also excluded expenses associated with cash management initiatives, including the IRS debt and annual pension funding obligation. A01100-01.

By the end of April 2023, the financial model "had the benefit of actual cash performance from August 2022 through April 2023," the deep involvement of the District's financial advisor in weekly cash management efforts, and, "at a minimum," incorporated into the underlying model the District's financial performance from "December 2022 to April 2023." A01141-42. At that time, the projections reflected that the District would become critically low on cash by January 2024 and subsequently run out of cash by November 2024 despite the short-term initiatives. A01636-37.

On May 22, 2023, the District's board adopted a pendency plan (the "Pendency Plan") and the supporting financial projections prepared by the District's financial advisor. A01618, A01622. The Pendency Plan presents two alternative long-term restructuring strategies in bankruptcy: (i) pursue a transaction with a larger health care system that can achieve sufficient economies of scale and preserve

current health care services for the County; or (ii) implement a responsible, phased service reduction absent a transaction. A01631-35. Both alternatives required the District to address the significant benefits expenses it had been unable to alter outside of bankruptcy. *Id*.

On May 22, 2023, the District's board authorized the District to file a bankruptcy case to achieve the restructuring objectives laid out in the Pendency Plan. A01618.  On May 23, 2023, the District filed its bankruptcy petition. A00001.

**F.**    **The District's Financial State and Outlook on the Petition Date.**

The District's financial state was grim on the Petition Date.  As of the Petition Date, the District held $9.5 million in its bank accounts, according to the District's bank account records. A01638 (Tab "Activity," Column P, Row 10072).[3] At the time, the District's operating expenses were $422,000 per day, leaving the District in violation of its bond covenants, with approximately 22.51 days of cash on hand on the Petition Date. A00729.

Significant debts remained unpaid as of the Petition Date ranging between $4.14 million and $5.2 million. ***First***, the District is obligated under its agreements with CNA, NUHW, and other unions to fund a benefit equal to 1.3% of each employees' annual compensation to the defined benefit plan each calendar year.

---

[3] All references to the Excel file at A01638 assumes the corrections are made to the formula in Column P of the Activity Tab set forth on the record. *See* A01124-27.

A01215-16. The annual funding amount is actuarially determined and includes the annual funding requirement and an amount necessary to satisfy the plan's unfunded actuarially accrued liability over time. A01210. The District presented a range of annual pension funding contribution calculations known or knowable as of the Petition Date: (i) the $3 million expense the District estimated when calculating its fiscal year end June 30, 2023 budget, based on estimated "hours [employees] worked that year," A1209; (ii) the most recent actuarially determined obligation as of the Petition Date, in the amount of $3.7 million, A01059; and (iii) the $4.05 million actuarially determined amount the District's actuaries calculated postpetition to determine the contribution based on facts as of the Petition Date, A00721. The District had not paid the budgeted pension funding obligation for calendar year 2022 as of the Petition Date. A1210. ***Second***, the District had not paid $1.14 million in the employer portion of payroll taxes deferred under the CARES Act due by December 31, 2022. A1202. ***Third***, the District's short-term cash management initiatives also relied heavily on the "slow payment" of trade vendors. A00862-63.

The District had no structured plan or ability to repay these debts. In each case, the District's chief financial officer confirmed that funding the pension and IRS obligations were "something we do when there is cash available" without regard to the maturity of the obligation. A01209.

17

Moreover, the cash on hand did not include any reserves for approximately $6.5 million of known contingencies required to responsibly maintain patient care and going concern operations. It remained the case that the District was required to consider the estimated $5 million it would take to responsibly transition patient care upon a closure. A01073-75. Additionally, the District was aware that a piece of equipment required to keep the hospital operating, with an approximate $1.5 million replacement cost, was already beyond end-of-life. A00828.

The District's net cash flow calculations demonstrated significant risk the District would deplete all cash on hand. As of the Petition Date, the District projected that its net cash flow for June 2023 through December 2023 would be *negative* $2.6 million. A01636. Projected net cash flow for calendar year 2024 was projected at *negative* $6.1 million. A01637. The District's financial expert at trial testified that simply paying the outstanding IRS and pension payments, alone, would result in a negative cash balance of $3.1 million in January 2024. A01311-12.

## G.  <u>The Eligibility Order</u>

CNA and NUHW filed objections to the District's eligibility to be a debtor under §§ 109(c) and 921(c). A00177, A00292. CNA argued that the District was not eligible because it was not insolvent, as that term is defined in § 101(32)(C), as required by § 109(c)(3). A00177. NUHW also alleged that the Debtor was not

insolvent and further argued that the Debtor did not file the Bankruptcy Case in good faith, under § 921(c). A00292.

On March 21, 2024, following a four-day bench trial in December 2023, the Bankruptcy Court entered the Eligibility Order. In the Eligibility Order, the Bankruptcy Court found that the Debtor was not insolvent, as that term is defined in § 101(32)(C). A00785, A00797. The Bankruptcy Court dismissed the Bankruptcy Case on those grounds, under § 921(c), and did not reach whether the Bankruptcy Case was filed in good faith.

## SUMMARY OF ARGUMENT

The Bankruptcy Court erred in its construction of the two statutory insolvency tests applicable to chapter 9 eligibility. Section 921(c) provides that a bankruptcy court may dismiss a chapter 9 bankruptcy case "if the petition does not meet the requirements of this title." 11 U.S.C. § 921(c). Section 109(c) sets forth the requirements for an entity to be eligible to be a debtor under chapter 9 of the Bankruptcy Code, including, among other things, that the entity is "insolvent." 11 U.S.C. § 109(c)(3). The Bankruptcy Code sets forth two alternative insolvency definitions applicable to municipalities in § 101(C)(32). As set forth more fully below, the District respectfully submits that the Bankruptcy Court committed reversible error when it found that the District did not establish by a preponderance of the evidence that it was insolvent under either of the two definitions.

As an initial matter, the Bankruptcy Court excluded from its analysis of both insolvency tests the District's outstanding and unpaid annual pension funding obligation based on a misapplication of applicable California law. The Bankruptcy Court held that nonpayment of the annual pension funding obligations is immaterial because "the District has no legal obligation to pay the actuarially determined contributions" to its pension. This legal holding—an issue raised by the Court and not the parties—contradicts California state law rendering immediately enforceable the annual funding requirements to satisfy present contractual funding obligations *and* an annual amount to satisfy the unfunded actuarially accrued liability of the plan. As such, the Bankruptcy Court committed legal error when it excluded the annual pension funding obligation from the insolvency analysis. Moreover, the Bankruptcy Court never concluded that its insolvency analysis would be unchanged had it considered the pension obligation. Accordingly, the legal error requires, at minimum, remand for further findings on the impact of the pension obligation to the Bankruptcy Court's analysis.

Under the first test, referred to as "current insolvency," a debtor is insolvent for purposes of chapter 9 eligibility if it is "generally not paying its debts as they become due." 11 U.S.C. § 101(32)(C)(i). ***First***, the Bankruptcy Court incorrectly found that the District waived current insolvency. The District stated it could pay going forward obligations on the Petition Date, but its ability to do so was contingent

on nonpayment of other debts like the IRS and pension. Indeed, when asked by the Bankruptcy Court at trial, the District's counsel expressly stated the District was not waiving the current insolvency argument. **Second**, had the Bankruptcy Court correctly recognized annual pension funding obligations as debts that are due and owing for purposes of the insolvency analysis, the undisputed amounts of the IRS and pension payment defaults alone require a finding of the District's insolvency under the applicable totality of the circumstances.

Under the second, so-called "prospective insolvency" test, a debtor is "insolvent" for purposes of chapter 9 eligibility if it is "unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C)(ii). **First**, the Bankruptcy Court adopted a more stringent standard for prospective insolvency by eschewing the "preponderance of the evidence" standard in favor of requiring that the District prove "that the numbers and projections in the forecast presents an accurate and reliable portrayal of its finances." As a practical matter, the Bankruptcy Court sought reconciliation of the District's forward-looking cash projections with the District's historical accrual-based financial reporting under GAAP despite evidence that the two accounting methodologies speak "different languages." The Bankruptcy Court's imposition of a standard that requires forward-looking projections to be as accurate as historical reporting (which can be verified with the benefit of hindsight) is a far more stringent standard than adopted by case law. **Second**, the Bankruptcy Court

focused solely on financial reporting and ignored case law requiring that the prospective insolvency analysis ultimately determine whether the "municipality [is] in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts." The narrow construction of the analysis and evidence deemed relevant erroneously constrained the legal inquiry applicable to prospective insolvency.

Additionally, the Bankruptcy Court abused its discretion in admitting expert testimony, over the District's objection, where the expert admittedly did not purport to be an expert in the cash insolvency standard set forth in the Bankruptcy Code. Despite this, the Bankruptcy Court admitted testimony—and ultimately adopted the expert's conclusion—that accrual-based accounting is a more accurate financial metric to determine insolvency under the applicable chapter 9 standard. Moreover, the Bankruptcy Court adopted the expert's conclusions about the reliability of the District's cash projections despite the expert's admission that he never reviewed the bank data underlying the projections.

## ARGUMENT

A. **The Bankruptcy Court Erred as a Matter of Law in Excluding the District's Largest Due and Unpaid Petition Date Obligation—the Annual Pension Funding Obligation—from Both Insolvency Analyses.**

The two alternative definitions for municipal insolvency are satisfied if the District was either "generally not paying its ***debts as they become due***" or "unable to pay its ***debts as they become due***." 11 U.S.C. § 101(32)(C) (emphasis added). "As 'due' is unqualified in § 101(32)(C), combining these definitions yields: presently, unconditionally owing and presently enforceable." *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998)). The Bankruptcy Court analyzed California cases holding that the entire unfunded actuarially accrued liability ("UAAL") of a pension system—in this case $14.7 million—is not "presently, unconditionally owing, nor presently enforceable." A00779-83. The Court then made an analytical jump that any portion of the District's ***annual contributions*** to the pension attributable to the UAAL is likewise unenforceable. *Id*. Conflating the total UAAL with the District's annual contributions is legal error because California's "vested rights doctrine" grants public plan participants have a constitutionally enforceable, implied contract right to an "actuarially sound retirement system." As discussed more fully below, those cases require a public entity to make contributions representing the public employer's "ongoing share of

23

the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees." Moreover, a party challenging an employer's failure to fund annual, actuarially determined contributions may bring their claims immediately, rather than waiting for the pension to ultimately fail. Accordingly, the holding that "the District has no legal obligation to pay the actuarially determined contributions," and the Court's omission of the District's multi-million-dollar annual pension contributions from both insolvency analyses, constitute reversible legal error.

1.  **California's Vested Rights Doctrine Recognizes a Constitutional Right to Annual Pension Funding That Renders the Pension "Actuarially Sound."**

"Both the United States and California Constitutions contain provisions that prohibit the enactment of laws effecting a 'substantial impairment' of contracts, including contracts of employment." *Cal Fire Local 2881 v. Cal. Pub. Emps.' Ret. Sys.*, 6 Cal. 5th 965, 977 (2019). This prohibition extends to substantial impairments of a public employee's implied contractual rights to a pension, which vest upon employment. *See Alameda Cty. Deputy Sheriff's Ass'n v. Alameda Cty. Emps.' Ret. Ass'n*, 9 Cal. 5th 1032, 1076 (Cal. 2020) (citing *Cal Fire Local 2881*, 6 Cal. 5th at 984-985; *Kern v. City of Long Beach*, 29 Cal. 2d 848 (1947)). "[T]he mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny

24

or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due." *Miller v. California*, 18 Cal. 3d 808, 815 (1977) (in bank) (quoting *Kern*, 29 Cal. 2d at 855).

The vested rights doctrine addresses the extent to which modifications to a pension plan impair the ultimate contingent liability to the employee-participant. "Under the 'California Rule,' as it has come to be known the contract clause of the state Constitution requires any modification of public employee pension plans to satisfy a standard established in a long line of California Supreme Court decisions." *Alameda Cty. Deputy Sheriff's Ass'n v. Alameda Cty. Emps.' Ret. Ass'n*, 9 Cal. 5th 1032, 1053 (Cal. 2020) (citing *Cal Fire Local 2881*, 6 Cal. 5th at 971; *Allen v. City of Long Beach* 45 Cal. 2d 128 (1955)); *In re City of Stockton, Cal.*, 526 B.R. 35, 55-56 (Bankr. E.D. Cal. 2015) (recognizing "vested rights" doctrines under California Constitution and United States Constitution). Although, pension rights may be modified prior to retirement under those narrow standards, the California "Supreme Court has repeatedly stated that [] pension rights may not be 'destroyed.'" *Marin Ass'n of Pub. Emps. v. Marin Cty. Emps. Ret. Ass'n*, 2 Cal. App. 5th 674, 696 (Cal. Ct. App. 2016) (collecting cases). "When the Supreme Court says that vested pension rights may not be 'destroyed,' it [prohibits] . . . effectively abolishing a pension plan [a] legislative authority refuses to fund." *Id.* at 701-702 (citing *Bellus v. City of Eureka*, 69 Cal. 2d 336, 352 (1968); *Valdes v. Cory*, 139 Cal. App. 3d 773,

25

787 (Cal. Ct. App. 1983); *Klench v. Bd. of Pension Fd. Commrs.*, 79 Cal. App. 171, 182 (Cal. Ct. App. 1926)).

The constitutional prohibition against "destroying" pension rights includes the temporary suspension of annual contributions to address fiscal crises. In *Valdes v. Cory*, retirees challenged California's enactment of "urgency legislation designed to balance the fiscal year 1981–1982 budget and to avoid a year-end deficit." 139 Cal. App. 3d at 777. The statute "prohibit[ed] the payment of state-employer contributions from the state general fund to the Public Employees' Retirement Fund for the months of April, May, and June 1982[, which] were previously appropriated for PERS funding in the 1981–1982 budget." *Id.* at 778. Other provisions similarly modified budgeted school-employer contributions to PERS for the same months and effectuated a "reversion" of those funds to the surplus of the state general fund. *See id.* The modifications would provide significant savings to the state, but "[t]here would be a corresponding diminution in the PERS reserve against deficiencies account[, and n]o provision [was] made for future replacement of this amount in the reserve account." *Id.*

The California Court of Appeal held that the suspension of contributions to the state pension—even if temporary—violated the contracts clauses of both the California Constitution and the United States Constitution. The legislation impaired vested rights of retirees because it required PERS to use funds held in a "reserve

against deficiencies" "to satisfy the state's contractual obligations to make monthly contributions to the retirement fund so that monies regularly appropriated for that purpose can irretrievably be redirected to balance the state budget." *Id.* at 788-789. Importantly, the Court of Appeal found specifically problematic that the legislation effected "a reduction without regard to actuarial consequences in funds previously allocated by legislative appropriation for special purposes." *Id.* at 790. The Court of Appeal made no distinction between contributions required for current benefits or UAAL when it held that:

> the Legislature's rescission of existing appropriations for employer contributions, theoretically representing the "employer's ***ongoing share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees***," substantially impairs public employees' assurance that they will ultimately receive the retirement benefits to which they become entitled. The loss of a $187 million appropriation to the retirement fund, together with the potential longterm investment yield therefrom is not inconsequential.

*Id.* at 789-790 (quoting *Carman v. Alvord*, 31 Cal. 3d 318, 325 (1982) (in bank)) (emphasis added). Accordingly, the Court of Appeal found the temporary failure to fund actuarially determined pension contributions was unconstitutional and invalid. *See id.* at 792-793.

Subsequent California decisions confirm that the vested rights doctrine includes a specific right to an "actuarially sound retirement system" that provides for annual contributions to fund current benefits and underfunding liabilities. *Bd. of Admin. v. Wilson*, 52 Cal. App. 4th 1109, 1131 (Cal. Ct. App. 1997). In *Wilson*, the

California Court of Appeal found unconstitutional statutes that authorized the state to fund pensions in arrears. *See id.* at 1118-1119, 1135. In construing *Valdes*, the Court of Appeal held that "[a]ctuarial soundness of the system is necessarily implied in the total contractual commitment, because a contrary conclusion would lead to express impairment of employees' pension rights." *Id.* at 1133. The Court of Appeal specifically reiterated its observation in *Valdes* that "[a]uthority is not lacking . . . for the proposition that employee pension beneficiaries have a vested interest in the integrity and security of the source of funding for the payment of benefits." *Id.* at 1134. In reviewing the evidence, the Court of Appeal found that the delay in arrears payments would render the pension actuarially unsound and, thus, found that the statutes in issue were unconstitutional.

The vested rights doctrine precludes the District from simply turning a blind eye to the effect of current pension contributions (or the lack thereof) to the long-term actuarial soundness of its pension. In *Hamilton Creek Metropolitan District*, the Tenth Circuit held that installment payments on bond obligations were not "due" because payment was only required in the underlying agreement "to the extent District funds were available." 143 F.3d at 1384-1385. As such, the "interest payments are neither presently, unconditionally owing, nor presently enforceable because they are indefinitely contingent on the availability of certain Plan-defined funds." *Id.* at 1385. By contrast, the California Constitution and United States

28

Constitution imply a contract obligation between the District and its employees that mandate annual pension contributions that maintain an actuarially sound pension, even though the ultimate payment to employee-retirees is contingent. As evidenced in the line of vested rights cases, these annual funding obligations are presently enforceable legal obligations that can be adjudicated prior to retirement and before any UAAL threatens imminent pension failure. The Court acknowledged the uncontested evidence that the District was not funding its defined benefit plan as of the Petition Date. A00782; *see also* A01210. Unlike *Hamilton Creek Metropolitan District*, deferral of the contributions did not arise from the nature of the underlying legal obligation, but, instead, the District's cash management decision to defer pension contributions notwithstanding the legal obligation. Accordingly, the District's annual, actuarially determined pension funding obligations (inclusive of amortized UAAL amounts) are "due" under the vested rights doctrine.

## 2. California Recognizes a Separate Constitutional Fiduciary Duty to Appropriately Fund a Pension.

In addition to the vested rights doctrine, the California Constitution imposes fiduciary obligations to public pensions. *See O'Neal v. Stanislaus Cty. Emps.' Ret. Ass'n*, 8 Cal. App. 5th 1184, 1208 (Cal. Ct. App. 2017) ("[I]t is clear from the text of California Constitution, article XVI, section 17 that, at a minimum, we must review the duties of trust fiduciaries to act for the benefit of and hold trust funds for

29

their beneficiaries"). In *O'Neal*, the Court of Appeal considered whether employees could state a claim for breach of constitutional fiduciary duty where a retirement board made two modifications intended to help "participating employers manage a [fiscal] crisis in the short term" by taking actions to reduce annual contributions for unfunded liabilities in the wake of the Great Recession. 8 Cal. App. 5th at 1192, 1217. ***First***, the Court of Appeal considered the way the board modified its funding of unfunded liabilities and found that the facts "could support an inference that [the board] took steps to reduce employer contributions owed under its actuarial calculations based on the financial interests of the employers." *Id.* at 1218. ***Second***, the Court of Appeal found a basis for a potential breach where amortization modifications for unfunded liabilities "could be viewed as ensuring at the time that the unfunded liabilities of the fund would increase each of those years and, potentially, in perpetuity." *Id.* at 1221. "With respect to both theories, evidence showing the resulting increase in unfunded liabilities and subsequent decrease in actuarial funding percentages could demonstrate potential damages accrued due to these changes." *Id.* This was the case even where the plan had no present "fiduciary obligation to pay nonvested benefits." *Id.* at 1220. As such, California's constitutional fiduciary obligations recognize ***a present obligation*** to make annual, actuarially determined contributions to a pension necessary to fund future benefits regardless of whether the benefits are presently due. Accordingly, the California

constitutional fiduciary duties establish a separate legal basis under which annual contributions are "due."

**3.** **The Eligibility Order, Which Addresses Whether the Entirety of an Unfunded Actuarially Accrued Liability Is Due, Misstates the Relevance of Actuarial Determinations.**

The Eligibility Order omits consideration of the District's annual pension funding obligations from both insolvency analyses, under § 101(32)(C), based on the erroneous conclusion that the District had "no legal obligation to pay the actuarially determined contributions." A00727. The Eligibility Order does not include an analysis of the California's vested rights doctrine or constitutional fiduciary duties. Instead, the Court relied upon cases holding that the total UAAL is "not considered current financial obligations." A00779. The Court's primary error was failing to distinguish between the total, contingent UAAL of a pension plan and the constitutionally imposed, annual contribution obligation to maintain the actuarial soundness of the pension.

The Eligibility Order principally cites to cases holding that the aggregate UAAL of a pension is not presently due and owing and either do not address annual pension contributions or acknowledge that they are analytically distinct liabilities. These cases stand for the uncontroversial proposition that a "[UAAL] does not represent a debt that is payable today." *Brandt v. Bd. of Ret.*, 136 Cal. App. 4th 140,

157 (Cal. Ct. App. 2006);[4] *see also Cty. of Orange v. Ass'n of Orange Cty. Deputy Sheriffs*, 192 Cal. App. 4th 21, 37 (Cal. Ct. App. 2011) ("An unfunded liability such as a UAAL is not created at the time of the award of enhanced benefits, but occurs over years."); *Mijares v. Orange Cty. Emps. Ret. Sys.*, 32 Cal. App. 5th 316, 325 (Cal. Ct. App. 2019) (accord). In *County of Orange*, the Court of Appeal specifically observed that "our case ***does not involve an annual payment*** to OCERS" when distinguishing the annual pension contribution analysis in *Carman*, *supra*. *Cty. of Orange*, 192 Cal. App. 4th at 37 (emphasis added). Indeed, highlighting the distinction between these two components of pension liabilities, the *County of Orange* held that the treatment of UAAL as indebtedness bears no similarity to that of pension contribution obligations. *Compare id.* (holding a UAAL "actuarial projection is not indebtedness as traditionally understood") *with Carman*, 31 Cal. 3d at 326 ("We hold that indebtedness as traditionally understood covers obligations arising under City's pension.").

In *Mijares*, the Court of Appeal rejected an employer's argument that the entire UAAL that arose following the retirement of all employes was immediately due and owing but affirmed the trial court's ruling that the retirement system had

_____

[4] *Brant* is also cited for the notion that "[t]he existence of [UAAL] is not in itself bad, any more than a mortgage on a house is bad." *See* A00779 (quoting *Brandt*, 136 Cal. App. 4th at 157). While this may be the case, the issue here is different: whether the District is required to make the mortgage payment.

authority to require payment of the UAAL through annual contributions. *See Mijares*, 32 Cal. App. 5th at 325, 330, 332-333 (observing that "there is a continuing obligation to assess the assets and liabilities needed for the retired employees' prospective benefits"). The Court of Appeal held that the applicable statutory authority "contain[ed] no express limitations on the County Retirement System's authority to seek payment of Unfunded Liability" and that, "[o]nce a retirement board sets contribution rates based upon the recommendation of its actuary, those rates are binding." *Id.* at 324, 329 (internal citations omitted). Accordingly, the cases cited by the Court stand for the proposition that the UAAL of a pension plan is not due and owing and do not address whether the annual contribution obligations that include an amortized amount necessary to fund a long-term UAAL are "due."

Indeed, the citation to *Imperial County Sheriff's Association* in the Eligibility Order confirms the obligation to fund annual contributions, inclusive of amounts necessary to satisfy the UAAL. The Court cited *Imperial County Sheriff's Association* for the distinction the Court of Appeal drew between normal cost and UAAL. *See* A00722 (quoting *Imperial Cty. Sheriff's Ass'n v. Cty. of Imperial*, 87 Cal. App. 5th 898, 903-904 (Cal. Ct. App. 2023)). However, the Court of Appeal in that case clarified that "[t]wo types of costs ***must be paid each year to fund the system retirement benefits*** of County employees: normal cost and the amortized payment of the unfunded actuarial accrued liability (UAAL)." *Imperial Cty. Sheriff's*

33

*Ass'n*, 87 Cal. App. 5th at 903-904 (emphasis added); *see also id.* at 904 ("Once the normal cost and UAAL contribution rates are determined and communicated to the County, the County Board is then statutorily obligated to implement the contribution rates recommended by the ICERS Board."). These cases either do not support, or contradict, the Court's ultimate legal conclusion that the District had "no legal obligation to pay the actuarially determined contributions."

Importantly, the Bankruptcy Court's ruling runs contrary to other chapter 9 eligibility rulings that considered annual pension contributions in the context of an insolvency analysis—none of which have attempted to parse the UAAL as the Bankruptcy Court did here. In the City of Chester's bankruptcy case, the court found that the city "did not make its full annual legally required pension payments, otherwise known as minimum municipal obligation" and found that

> it is clear that the City is insolvent because it is currently unable to fund, and historically has failed to fund, its substantial obligations under the Pension Plans, ***which are unconditionally owed and presently enforceable***.

*In re City of Chester*, 649 B.R. 633, 655 (Bankr. E.D. Pa. 2023) (emphasis added). Moreover, the court actually considered the $100 million UAAL and the city's "consistently underfunded pension obligations" in its current insolvency analysis as further indicia of insolvency. *Id.*

Likewise, in the City of Detroit's bankruptcy case, the bankruptcy court found that the city was "generally not paying its debts as they came due," under

34

§ 101(32)(C)(i), in part because it "deferred payment" on its "pension contributions." *In re City of Detroit, Mich.*, 504 B.R. 191, 262 (Bankr. E.D. Mich. 2013). The pension contributions at issue were necessary analyzed "[u]sing current actuarial assumptions" that were projected to grow depending on changes in the underlying actuarial assumptions. *Id.* at 208-209. The *City of Detroit* court undertook no effort to parse the actuarially determined contributions associated with underfunding liabilities despite acknowledging that the city had substantial UAAL. *Id.* at 208; *see also City of Chester*, 649 B.R. at 656 (finding city prospectively insolvent where "it is apparent that further budget cuts alone will not make a dent in the substantial outstanding and ongoing pension obligations and retiree healthcare costs"). The Eligibility Order does not distinguish *City of Chester* or *City of Detroit* or offer other rationale for departing from the underlying presumption that annual pension funding obligations must be considered for purposes of insolvency, regardless the components of the actuarially determined annual funding obligation.

The Bankruptcy Court committed legal error when it extrapolated, from cases addressing unfunded actuarially accrued liabilities, that "the District has no legal obligation to pay the actuarially determined contributions" to its pension without regard to California's vested rights doctrine or constitutional fiduciary duties. The Court's insolvency rulings in the Eligibility Order must be reversed because this

35

misstatement of law resulted in the omission of one of the District's principal, unpaid debts on the Petition Date, the pension, from either insolvency analysis.

**B.    Current Insolvency under § 101(32)(C)(i).**

**1.    The District Did Not Waive Its Right to Argue That It Was Currently Insolvent.**

The Bankruptcy Court erroneously held that the District waived the argument that it was insolvent under § 101(32)(C)(i). A00721. The Bankruptcy Court acknowledged that the District explicitly asserted at trial, and in posttrial briefing, that it was insolvent under § 101(32)(C)(i) and that it was not waiving the argument. *See* A00803 ("THE COURT:  . . . I do have a question before we begin, which is, I'm wondering if the debtor is actually contesting 101(32)(C)(i) . . . .  MR. SWEET: That's right, Your Honor. We're not waiving that issue."); *see also* A00697-700. Nevertheless, the Bankruptcy Court cites to two statements that it holds as amounting to a waiver of the right to argue current insolvency under § 101(32)(C)(i):

- A Petition Date declaration by the District's CEO stating, "[a]s of the date of this Declaration, the District is projected to hold sufficient cash on hand to continue operations without a reduction in services through December 2023, assuming the District makes no further changes to its operations." A00721.

- A prepetition staff report to the District's Board that states, "[t]he current cash flow forecast indicates that, while it was cash flow insolvent in November 2022, the short-term stabilization efforts have removed it from qualifying as cash-flow insolvent." A00721.

Importantly, however, the Court does not reconcile these statements with the legal standard for current insolvency or the operative facts underlying the cited statements.  A municipality is insolvent, under § 101(32)(C)(i), if it is "generally not paying its debts as they become due." 11 U.S.C. § 101(32)(C)(i).  The District's Petition Date operations, and the cash flow forecast referenced in the staff report, both contemplate nonpayment of the $1.1 million debt to the IRS and nonpayment of annual pension funding obligations. *See, e.g.*, A01210 ("Q. So although the pension was included as an expense in the budget, was that contribution made as budgeted? A. It was not.  . . . We did not pay the IRS."); A1055-56 (identifying significant assumptions in the District's cash projections, including nonpayment of annual pension contributions and IRS debt).  Accordingly, the District's statements that it could continue operations was explicitly premised on nonpayment of other debts.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). The Bankruptcy Court does not square the two statements by the District cited in the Court's waiver analysis with the underlying legal standard for insolvency, under § 101(32)(C)(i). As the District argued, nonpayment of a few significant obligations, such as the annual pension funding and IRS obligation, are material considerations under the Ninth Circuit's totality of the circumstances test for current insolvency, discussed below.

The payment of trade liabilities to continue operations as of the Petition Date does not waive the District's insolvency argument where the District only funded ongoing operations through intentional nonpayment of other debts (i.e., the IRS and pension) owing as of the Petition Date. *See Detroit*, 504 B.R. at 263 (finding current insolvency where "the City stopped paying its trade creditors to avoid running out of cash. But for these and other deferments, the City would have completely run out of cash by the end of 2013."). The District's ability to continue funding operations on the Petition Date did not serve to waive its right to argue that nonpayment of other debts still rendered it insolvent. Accordingly, the Bankruptcy Court's waiver holding must be reversed because it resulted from the misapplication of historical facts to the applicable legal standards governing waiver and insolvency under § 101(32)(C)(i).

2. <u>**The Omission of the Annual Pension Funding Obligation from the Totality of the Circumstances Test Is Not Harmless Error Where the Debt Is Material.**</u>

Courts in the Ninth Circuit analyze the totality of the circumstances to determine whether nonpayment of certain debts rises to the level of "general nonpayment" contemplated by the statute. *See* Eligibility Order at 21 (citing *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1072 (9th Cir. 2002)). "[T]here is 'substantial authority for the proposition that even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt

or debts are sufficiently substantial to establish the generality of the alleged debtor's default.'" *In re Marciano*, 446 B.R. 407, 421 (Bankr. C.D. Cal. 2010) (quotation omitted), *aff'd*, 459 B.R. 27 (B.A.P. 9th Cir. 2011), *aff'd* 708 F.3d 1123 (9th Cir. 2013). This is particularly the case where the debtor has "substantial amounts of unpaid bills and no plans or ability to pay them." *Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media)*, 378 F.3d 916, 929 (9th Cir. 2004) (superseded by statute on other grounds).

The District presented undisputed evidence that the IRS debt and annual pension obligation were unpaid as of the Petition Date and that the District had no ability or plan to repay the debts. As set forth above, the parties did not contest that the IRS obligation, in the amount of $1.14 million, and the annual pension funding obligation, in an actuarially determined amount ranging from $3 million to $4.05 million depending on the date of calculation, were unpaid on the Petition Date. A00721. The amounts of the obligations are undisputed—the only dispute is whether the pension obligation was "due and owing" for purposes of the insolvency analysis. The District also presented uncontested evidence that the District's funding plans for both obligations were non-existent: the District would fund either as cash materialized to do so. A01100, A1209-10. However, the cash never materialized and were intentionally omitted from cash forecasting as a cash management strategy. A1209-10. The only evidence submitted concerning the effect of paying these debts

39

as of the Petition Date came from the District's financial advisor and expert, who both concluded that payment would "quite substantially" advance the projected run out of cash date for the District and cause an immediate cash crisis. A01101. In the *City of Chester*, the court found current insolvency under nearly identical grounds, holding that:

> Because the City has not been paying its debt obligations as they become due and its revenues are insufficient to pay off its [minimum annual pension funding] obligations and tax obligations, *inter alia*, the City is insolvent pursuant to the first prong under § 101(32)(C)(i).

*City of* Chester, 649 B.R. at 655. Based on the preponderance of the evidence—indeed the uncontested evidence—the Bankruptcy Court erred in holding that the District was not currently insolvent given the significance of the debts.

At minimum, the Bankruptcy Court's legal conclusion that the annual pension funding obligation was not "due and owing" requires remand for further findings. The Bankruptcy Court never concluded that its analysis of the totality of the circumstances test would remain unchanged if the annual pension funding obligation were considered in addition to the IRS obligation. Instead, the Bankruptcy Court focused solely on the IRS obligation and concluded that it, alone, "does not rise to the level of general nonpayment contemplated by § 101(32)(C)(i)." A00729. As such, remand for further findings is necessary to the extent this Court finds the

annual pension funding obligation a debt for purposes of the current insolvency analysis.

**C.**    **Prospective Insolvency under § 101(32)(C)(ii).**

       **1.**    **The Bankruptcy Court's Reliance on Accrual-Based Historical Financial Data to Contradict Cash Projections Is Inconsistent with the Legal Standard for Insolvency under § 101(32)(C)(ii) and the Applicable Burden of Proof.**

Section 101(32)(C)(ii) provides that a municipality is insolvent if it is "unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C)(ii). The § 101(32)(C)(ii) "language 'unable to pay as they become due' in the municipal insolvency definition implicates the notions of time and projections about the future." *City of Stockton, Cal.*, 493 B.R. at 788. "[A] municipality need not be actually out of cash before it is cash insolvent." *Id.* The analysis requires "a projection of the availability of expected cash to meet expected expense" to determine the "actual point of running out of cash." *Id.*; *see also City of Bridgeport*, 129 B.R. at 337-338. The District has the burden to establish insolvency under "the familiar preponderance-of-evidence standard of basic civil litigation." *In re City of Stockton, Cal.*, 475 B.R. 720, 726 (Bankr. E.D. Cal. 2012).

In the Eligibility Order, the Bankruptcy Court adopted a more stringent standard for prospective insolvency. The Bankruptcy Court held that the District

"has the burden of proving that the numbers and projections in the forecast presents an accurate and reliable portrayal of its finances." A00731. The statement of law crafted by the Bankruptcy Court appears to derive from its interpretation of Generally Accepted Accounting Principles ("GAAP"), which the Bankruptcy Court explains "are designed to create financial reports that are accurate and reliable." A00733. Yet, courts typically reject the use of GAAP as a legal standard for balance sheet insolvency determinations. *See In re Kaypro*, 218 F.3d 1070, 1076 (9th Cir. 2000) (evaluating balance sheet insolvency and holding that "[t]here is no generally accepted accounting principle for analyzing the insolvency of a company"); *In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) (evaluating balance sheet insolvency and holding that "[r]equiring application of GAAP would make accountants and the board which promulgate GAAP the arbiters of insolvency questions. Clearly the Code provides that judges should make such decisions."). This is particularly the case in chapter 9, where the insolvency definition requires a projected cash flow analysis and precludes consideration of "balance sheet" insolvency. *See, e.g.*, *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 84 (Bankr. D. Colo. 1990); *In re City of Vallejo*, 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009). Moreover, the strict GAAP standard conflicts with the broad construction of "§ 109(c)'s eligibility requirements to provide access to relief in furtherance of the Code's underlying policies." *Vallejo*, 408 B.R. at 289 (quoting *In re Valley Health*

*Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008)) (internal quotations omitted). Accordingly, the Bankruptcy Court erred in adopting an incorrect legal standard for prospective insolvency.

Assuming, *arguendo*, the Bankruptcy Court's construction of the prospective insolvency test is correct, the Bankruptcy Court erred in is application of the burden of proof to the test. Courts analyzing insolvency commonly find that the preponderance of the evidence standard is satisfied through testimony of witnesses familiar with a municipality's finances, even in the absence of expert testimony. *See, e.g.*, *Detroit*, 504 B.R. at 264 (finding insolvency based on lay testimony of financial advisors with "extensive personal knowledge of the City's affairs" and "reject[ing] [] argument that expert testimony is essential"); *Stockton*, 493 B.R. at 790 (relying on testimony concerning availability of local tax measures as a viable funding source). The District provided detailed testimony that its cash flow projections were the result of a "rolling work product"—weekly cash flow projections—"that [its financial advisor] started in November of 2022 and then updated weekly throughout the pendency of the case." A01131. The original projections were premised on the District's actual performance from August 2022 through October 2022. A01141. The historical performance data was comprised of the District's bank data, which was imported to a financial model and adjusted for the District's projected schedule and

43

estimates for supplemental revenue receipts.[5] A01054. The cash flow projections also excluded expenses associated with cash management initiatives, including the IRS debt and annual pension funding obligation. A01100-01. By the time of the bankruptcy filing, the financial model "had the benefit of actual cash performance from August 2022 through April 2023," the deep involvement of the District's financial advisor in weekly cash management efforts, and, "at a minimum," incorporated into the underlying model the District's financial performance from "December 2022 to April 2023." A01141-42. The cash flow projections used with the bankruptcy filing were prepared shortly after the last full week of April 2023 and reflected that the District would run out of cash in November 2024. A01131-32, A01636. The District's financial expert added in the IRS and pension payment obligations and concluded that these adjustments, alone, would result in a negative cash balance of $3.1 million in January 2024. A01312. The testimony provided thorough explanations of the basis of the projections from persons with first-hand

---

[5] The Eligibility Order asserts that "[w]ithout any breakdown of revenues and expenses, the court cannot evaluate B. Riley's figures vis-a-vis the District's own historical numbers and the context of how B. Riley estimated the various figures." A00735. However, the District's financial advisor gave detailed testimony concerning the source of revenues and expenses that were unchallenged. A01099-105. The notion that the District did not meet its burden because its projections did not offer the same line-items as the District GAAP based historical financial reporting further suggests application of a more stringent and legally inaccurate standard.

knowledge of the District's finances and, thus, satisfied the District's burden even under the Bankruptcy Court's restrictive, GAAP-based legal standard.

The Bankruptcy Court erred by requiring the District to produce projections that matched actual historical results. The Court found that the District's projections did not "present an accurate and reliable portrayal of its finances" because they did not square with the District's historical financial records reported under GAAP. A00731-34. The Bankruptcy Court compared the projected ending cash balance for December 2022 and April 2023 with the District actual cash on hand at the end of each period. A00732. The Bankruptcy Court observed that actual cash on hand at the end of each period was greater than projected—ranging from $614,253 greater to $6.2 million greater than projected—while the District was incurring $422,000 in daily operating expenses.[6] *Id*. The District gave five[7] specific examples why the projected cash would be less than what was ultimately on hand at the end of a given period—the difference between revenue and expense realization in accrual versus cash accounting, the different reporting dates, the District's efforts to advance actual cash receipts before projected periods, the omission of restricted and petty cash, and

---

[6] The Bankruptcy Court also erroneously aggregated the differences between each measurement date to conclude a $15 million difference in projected cash over actual cash. A00735. This is not supported by the evidence—a difference of that magnitude would be reflected in a difference between reported and actual cash of $15 million during a particular measurement date. The record contains no such $15 million difference between actual and projected cash on any given date.

[7] The Eligibility Order cites to only two. A00732.

unbudgeted revenue. A001054-55, A01115-17, A01129; *see also* A01638 (Tab "Activity," Rows 10347 & 10701).

By contrast, the Bankruptcy Court's analysis centers on efforts to reconcile the District's accrual-based historical financial records with cash-based projections that do not "speak the same language" and "aren't comparable" for direct reconciliation purposes. A01054-55, A01162-63. The difference between accrual accounting and cash accounting can lead to a "substantial difference in results" because the methods can result in alternative "date[s] when [the entity] records the revenue it earns." *See, e.g.*, *Ralston Dev. Corp. v. U.S.*, 937 F.2d 510, 514-515 (10th Cir. 1991); *United States v. Suddarth*, 795 Fed. Appx. 337, 385 (6th Cir. 2019) (Clay, J. dissenting). Accrual accounting is antithetical to the ultimate legal issue—whether and when the District will run out of cash—because its focus on in "when did the transaction occur and recording that transaction in the proper period" rather than identifying "what is my prospective cash balance look like?" A01054-55; *see also* *Mid-Del Therapeutic Ctr., Inc. v. C.I.R.*, 30 Fed. Appx. 889, 891 n.1 (10th Cir. 2002) (unpublished) (explaining that the cash method of accounting includes income and expenses in the year "in which they are actually received or made" whereas the accrual method does so when "all of the events have occurred that fix the right to receive income or pay liability").

By way of example, the District's own bank records reflect approximately $9.5 million of cash on hand on the Petition Date. A01638 (Tab "Activity," Column P, Row 10072). Yet, just eight days later, on May 31, 2023, the cash balance in the District's accounts grew to $13.7 million. A01123. The District's GAAP-based financial statements—which only recorded cash on hand at month-end—reflected $14.9 million on hand as of May 31, 2023. A01128-29. The multi-million-dollar difference in eight days of operations is simple and confirmable after reviewing the District's bank records: the natural variability in the District's realization of supplemental revenue from its payors and an earlier-than-projected closing of the sale of District real estate.[8] The smaller difference between the cash and GAAP month-end accounting is also easily explained: cash accounting only included accounts that could be easily liquidated (a $400,000 difference), the recordation of income when deposited under cash accounting versus when income is received but not yet deposited in accrual accounting, and voided checks. A01129. The testimony

---

[8] At trial, the District showed the difference totaled approximately $4.5 million. On May 24, 2024, the District received a $1.1 million Distinct Part Unit supplemental payment and approximately $300,000 of additional Rate Range reimbursement that were unexpected payments and unbudgeted in the Pendency Plan. A01115, A01638 (Tab "Activity," Rows 10189 & 10166). The District also realized the $1.5 million revenue from sale of real estate on May 26, 2023 and $1.2 million of Quality Incentive Pool payments that were both budgeted for later in June 2023. *See id.*; *see also* A01638 (Tab "Activity," Rows 10347 & 10701).

47

at trial clearly explains the variances—the Bankruptcy Court's effort to engage in a month-to-month direct reconciliation was flawed.

The Bankruptcy Court erred when it required the District to demonstrate that its projections satisfied the same level of accuracy as historical financial reporting without respect to testimony and required reconciliation with an accrual-based financial report inconsistent with the ultimate legal inquiry under § 101(32)(C)(ii).

## 2. **The Bankruptcy Court Narrowly Limited Its Analysis to the District's Financial Projections and Misconstrued the District's Expert Evidence.**

"The theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts. The insolvency must be real and not transitory." *Stockton*, 493 B.R. at 788. As such, under § 101(32)(C)(ii), "longer-term budget imbalances (budget insolvency) and the degree of inability to fund essential government services (service delivery insolvency) also inform the trier of fact's assessment of the relative degree and likely duration of cash insolvency." *Id.* at 789; *see also Detroit*, 504 B.R. at 263. The court in *Stockton* analyzed budget and service delivery insolvency to determine whether the insolvency was "persistent" and "not a mere technical insolvency." *Stockton*, 493 B.R. at 791. Contrary to the Bankruptcy Court's holding,

48

the *Stockton* court also concluded that these considerations are independent bases to find insolvency. *Compare id.* at 789 ("even if the projections . . . did not suffice to support a conclusion of cash insolvency per § 101(32)(C), the inability to formulate a balanced budget . . . without impairing contractual obligations independently supports the finding of insolvency) *with* A00736 ("the *Stockton* decision . . . only considered other categories to ascertain whether . . . the city was manufacturing insolvency"). Similarly, the analysis of prospective insolvency in *City of Detroit* places significant emphasis on service delivery insolvency. *See Detroit*, 504 B.R. at 263-264 (while financial insolvency metrics "might more neatly establish the City's 'insolvency' under 11 U.S.C. § 101(32)(C), it is the City's service delivery insolvency that the Court finds most strikingly disturbing in this case").

The Bankruptcy Court committed two reversible errors in its prospective insolvency analysis. ***First***, the Bankruptcy Court erred by mischaracterizing the cash flow test performed by the District's expert. The principal cash flow test performed by the District's expert involved adding to its financial projections the repayment of the District's debt to the IRS and pension obligations without any other modification. A01309-10. These two changes resulted in a negative cash on hand balance of $3.1 million in January 2024. A01311-12. The Eligibility Order does not address this independent test performed by the District's expert—other than by making the legally incorrect determination that annual pension funding is not a debt and

recasting doubt on the underlying projections. A00736. Moreover, even accepting the Bankruptcy Court's criticism of the underlying projections, the Bankruptcy Court never addressed the fact that these modifications rendered the District cash flow negative below even the largest variance between actual and projected cash by August 2024. *Compare* A01669 (projecting negative $6.5 million cash on hand in August 2024) *with* A00732 (asserting $6.2 million variance between projected and actual cash on hand in February 2023). The Bankruptcy Court erred when it did not address that the District was projected to be out of cash by August 2024 under the strictest standards.

*Second*, the Bankruptcy Court unduly limited its analysis of the District's prospective insolvency by focusing on whether "two sources" of financial data—the District's cash flow projections and expert report and testimony—satisfied the District's burden. A00730. The Bankruptcy Court faults the District's expert for considering other "subcategories" of financial metrics utilized by the District's expert to perform a "confirmatory" solvency analysis that admittedly considered cash needs beyond the standard chapter 9 insolvency test. A00736, A01314. However, the Court acknowledges as "undisputed" that the District was "in a dire financial situation at the end of 2022," when it was down to just 1.5 days' cash on hand and was on the verge of missing payroll. A00711, A00853-54. In the course of preserving operating cash, the District closed a service line, obtained loans and

advances on future payments, froze hiring, delayed vendor payments, and sold property, among other things. A00861-64. The District's cash on hand improved as a result, but it was "operating on a 'razor's edge' for several months prior" to the Petition Date. *See Detroit*, 504 B.R. at 263. And it remained the case that the District was required to consider the estimated $5 million it would take to responsibly transition patient care upon a closure or the $1.5 million it would cost to replace a necessary piece of equipment already beyond end-of-life. A00828, A01074. Moreover, although the Bankruptcy Court adopted the CNA expert's much lower cash on hand requirement, the Bankruptcy Court never squared this testimony with the fact that the District still held far less cash on hand than that standard on the Petition Date. *Compare* A00797 (union expert supported 59.8 day's cash on hand as sufficient) *with* A00785 (identifying range of 28.7 and 35.4 days of cash on hand). The Bankruptcy Court's analysis omits all of these factors that bear directly on whether the District really did (or could) rebound from its admittedly undisputed insolvency in December 2022.

Accordingly, the Bankruptcy Court's reliance on limited evidence and its narrow construction of the breadth and ultimate aim of the prospective insolvency analysis constitute reversible error.

**D.**     **The Bankruptcy Court's Misplaced Reliance on CNA's Expert Witness and Erroneous Admission of Testimony as Expert Testimony.**

      **1.**     **The Expert's Conclusion That Accrual Based Reporting "Is More Reliable" Than Cash Forecasting Contradicts the Legal Standard Applicable to Chapter 9 Insolvency.**

The Bankruptcy Court erred in overruling the District's motion in limine to exclude CNA's expert testimony. Courts must exclude expert testimony that applies the incorrect legal standard. *See Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 17, 2018) ("Expert testimony [ ] should be excluded when it applies the wrong legal standard.") (citing cases); *In re Novatel Wireless Sec. Litig.*, 846 F.Supp.2d 1104, 1108 (S.D. Cal. 2012) (excluding expert testimony for applying wrong legal standard); *United States Gypsum Co. v. Lafarge North America, Inc.*, 670 F.Supp.2d 737, 745 (N.D. Ill. 2009) (excluding expert witness from testifying where expert "applied the incorrect legal standard in formulating damages"); *Munro v. Univ. of S. California*, 2022 WL 16955481, at *4 (C.D. Cal. Nov. 1, 2022) (finding expert's conclusions neither reliable nor relevant because it is "premised on an incorrect legal standard").

The insolvency definition applicable to municipalities in chapter 9 is unique from other insolvency definitions in the Bankruptcy Code. "The language 'unable to pay as they become due' in the municipal insolvency definition implicates the

notions of time and projections about the future." *City of Stockton, Cal.*, 493 B.R. at 788. By contrast, "[t]he primary use of 'insolvent' in other chapters of the Bankruptcy Code refers to what is commonly described as 'balance-sheet insolvency,' which is a financial condition such that liabilities exceed assets." *City of Stockton, Cal.*, 493 B.R. at 788 (emphasis added); *see also Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. at 84 ("For most bankruptcy purposes, insolvency is a balance sheet test."). "However, for Chapter 9 purposes insolvency is not a balance sheet test, but instead is a question of whether the debtor is unable to pay its debts as they come due." *Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. at 84.

It is undisputed—and acknowledged by the Bankruptcy Court—that CNA's expert was not presented as an expert in chapter 9 insolvency. A00754. Nevertheless, the Bankruptcy Court permitted the expert to testify as to whether financial documents based on accrual-based or cash-based accounting are more reliable *in the context of a chapter 9 insolvency analysis*. A00735, A00753. Indeed, the Bankruptcy Court ultimately adopted the expert's conclusion that "GAAP-based statements are designed to create financial reports that are accurate and reliable." A00733. However, the expert's unfamiliarity with—and failure to utilize—the chapter 9 insolvency standards that explicitly require focus on projections that the municipality will run out of cash render the expert's conclusion untethered from a legal standard. Accordingly, the Bankruptcy Court abused its discretion when it

overruled the District's objection to the expert's testimony and subsequently adopted the expert's position with respect to the most reliable accounting methodology for purposes of assessing chapter 9 insolvency.

2.     **The CNA Expert Ignored Available Evidence of the District's Bank Account Balances, in Favor of Accrual Based Monthly GAAP Reporting, to Sew Doubt About the District's Cash Projections.**

CNA admits that its expert concluded the District's cash projections were inaccurate while never actually considering the underlying financial data supporting the projections. The Bankruptcy Court found "well-reasoned and credible" the expert's conclusion that the District's cash forecasts were unreliable. A00735. However, the expert admittedly did not consider or reconcile the projections (and the District's explanations for variances) with the District's bank records. A00752, A01464. Moreover, the expert never formed an opinion concerning the reason for the allegedly inaccurate projections. A01380-81 ("*I don't know why*, because I didn't have access to the same kind of information that they had access to but it would seem to me that there is something that's missing from their numbers") (emphasis added). Without considering the underlying data supporting the projections, the expert's ultimate conclusion that the projections are "speculative" is, itself, mere speculation without a foundation in the data that actually served to create the projections. *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.

Supp. 2d 461, 469 (S.D.N.Y. 2005); *LinkCo., Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting expert report that "'does no more than counsel . . . will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct'"). Accordingly, the Bankruptcy Court abused its discretion in accepting the conclusion of CNA's expert concerning the reliability of cash projections where the expert admittedly did not base the opinion on available confirmatory data.

## CONCLUSION

For the foregoing reasons, the District respectfully requests that this Court: (i) reverse the Bankruptcy Court's ruling in its Eligibility Order that the District did not establish that it was insolvent under a preponderance of the evidence, find that the District is eligible to be a debtor under §§ 109(c) and 921(c) and not subject to dismissal, and remand for further proceedings; or (ii) in the alternative, reverse the Bankruptcy Court's ruling on the legal tests for insolvency under § 109(c) and remand for further findings consistent with the appropriate test for insolvency.

[*The remainder of this page is intentionally blank.*]

Respectfully submitted,

**FOX ROTHSCHILD LLP**

Dated: July 17, 2024           By:  */s/ Nicholas A. Koffroth*
                                    Michael A. Sweet
                                    Jack Praetzellis
                                    Nicholas A. Koffroth
                                    *Counsel for the San Benito Health Care*
                                    *District dba Hazel Hawkins Memorial*
                                    *Hospital*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

I hereby certify that the foregoing document complies with the type-volume limit of FED. R. BANKR. P. 8015(a)(7)(B) (allowing 13,000 words) because, excluding the parts of the document exempted by FED. R. BANKR. P. 8015(g), this document contains 12,730 words. This document complies with the typeface requirements of FED. R. BANKR. P. 8015(a)(5) and the type-style requirements of FED. R. BANKR. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: July 17, 2024

_/s/ Nicholas A. Koffroth_
Nicholas A. Koffroth

160689364.1

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system.

I further certify that parties of record to this appeal who either are registered CM/ECF users, or who have registered for electronic notice, or who have consented in writing to electronic service, will be served through the CM/ECF system.

I further certify that I have also served the foregoing document by the means set forth below on the following parties:

### Courtesy Copies via Personal Delivery

Chambers of the Honorable James Donato
United States District Court
Office of the Clerk
450 Golden Gate Ave, 16th Floor
San Francisco, CA 94102

Dated: July 17, 2024                   */s/ Nicholas A. Koffroth*
                                        Nicholas A. Koffroth

160689364.1