UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SAN BENITO HEALTH CARE DISTRICT<br><br>Debtor.<br><br>_____<br><br>SAN BENITO HEALTH CARE DISTRICT dba HAZEL HAWKINS MEMORIAL HOSPITAL<br><br>Appellant,<br><br>v.<br><br>CALIFORNIA NURSES ASSOCIATION & NATIONAL UNION OF HEALTHCARE WORKERS<br><br>Appellees. | Case No.24-cv-02266-JD<br><br>**ORDER RE APPEAL** |

After months of financial distress and cost-cutting measures in 2022 and 2023, appellant San Benito Health Care District (San Benito or District) filed for bankruptcy on May 23, 2023. Appellees California Nurses Association and the National Union of Healthcare Workers (together Objectors) objected to the bankruptcy on the principal ground that San Benito was not "insolvent" for purposes of bankruptcy relief. The bankruptcy court held a four-day bench trial in December 2023 and issued a thorough order dismissing the petition on the ground that the District "ha[d] not met its burden of proving it was eligible to be a debtor under chapter 9." A00741.[1]

San Benito appeals the dismissal of its petition and assigns several errors to the bankruptcy court's insolvency determination. The bankruptcy court order states in detail the largely

---

[1] Citations to the appellate record accord with its internal pagination, not the ECF pagination as it appears on the docket. *See* Dkt. Nos. 9-10.

1  undisputed facts, which the Court will not repeat here. The parties' familiarity with the record is
2  assumed. The dismissal of the petition is affirmed.² Each side will bear its own attorney's fees
3  and costs.

## DISCUSSION

### I. STATUTORY BACKGROUND

Chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901-946, is titled "Adjustment of Debts of a Municipality" and provides bankruptcy relief to municipalities in financial distress. The Code sets forth five discrete criteria that must be met before obtaining Chapter 9 relief: the petitioning entity (1) is a municipality; (2) is authorized under state law to petition for bankruptcy; (3) is insolvent; (4) desires to institute a plan to adjust its debts; and (5) has agreed, negotiated, or attempted to negotiate with its creditors. 11 U.S.C. § 109(c). The municipality bears the burden of establishing eligibility for relief. *In re City of Vallejo*, 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009). The only criterion at issue in this appeal is insolvency. The day on which the municipality filed its bankruptcy petition (petition date) is the relevant time for assessing insolvency. *See In re Woods*, 743 F.3d 689, 705 (10th Cir. 2014).

The Bankruptcy Code provides several definitions relevant here. To start, the Code states that a municipality is insolvent when it is either (A) "generally not paying its debts as they become due unless such debts are subject to a bona fide dispute"; or (B) "unable to pay its debts as they become due." *Id.* § 101(32)(C). The Court will refer to these alternate forms of insolvency as "current" and "prospective" insolvency, respectively. "Debt" is defined as "liability on a claim," *id.* § 101(12), and "claim" in turn is relevantly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," *id.* § 101(5)(A).

### II. LEGAL STANDARDS

A bankruptcy court's legal conclusions are reviewed de novo. *See In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004). Its findings of fact will be disturbed only if clearly erroneous, meaning

---

² The Objectors' motion to supplement the record, Dkt. No. 13, is denied as moot.

2

the Court "must accept the bankruptcy court's findings of fact unless, upon review, the court is left with the definite and firm conviction that a mistake has been committed by the bankruptcy judge.'" *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009). "If two views of the evidence are possible, the [bankruptcy] judge's choice between them cannot be clearly erroneous." *In re Marshall*, 721 F.3d 1032, 1039 (9th Cir. 2013) (citation omitted). A mixed question of law and fact, where the "primary facts are undisputed and ultimate inferences and legal consequences are in dispute," is reviewed without deference to the bankruptcy court's conclusions. *Suzy's Zoo v. C.I.R.*, 273 F.3d 875, 878 (9th Cir. 2001). The bankruptcy court's dismissal may be affirmed on any ground made manifest by the record. *See In re Warren*, 568 F.3d 1113, 1116 (9th Cir. 2009).

To the extent questions of state law are relevant to a federal bankruptcy proceeding, the Court's "duty . . . is to ascertain and apply the existing California law." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 889 (9th Cir. 2010) (quoting *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008) (per curiam)). "In the absence of definitive pronouncements from the Supreme Court of California, 'we follow decisions of the California Court of Appeals unless there is convincing evidence that the California Supreme Court would hold otherwise.'" *Cao v. Bank of Am., N.A.*, No. 24-cv-01195-JD, 2025 WL 660248, at *1 (N.D. Cal. Feb. 28, 2025) (quoting *Carvalho*, 629 F.3d at 889).

### III.  ANNUAL PENSION FUNDING OBLIGATION

San Benito argued to the bankruptcy court it was currently and prospectively insolvent because it could not, and did not, pay certain large debts. A00697-701. The two main obligations the District emphasized were $1.14 million "in the employer portion of payroll taxes [that had been] deferred" that the Internal Revenue Service was at the time demanding and its "annual pension funding obligation" under the controlling collective-bargaining agreements (CBAs). A00698. "Given the variance in the annual funding obligation," San Benito proffered at the December 2023 trial three estimates "known or knowable as of the Petition Date" for what that obligation might look like for the calendar year: (1) $3 million, derived from its own estimation of "hours [employees] worked that year" when "calculating its fiscal year end June 30, 2023 budget"; (2) $3.7 million, an amount actuarially determined by San Benito's financial advisor as of the

3

petition date; and (3) $4.05 million, an amount actuarially "calculated postpetition effective as of" the petition date by the financial advisor. A00698.

The bankruptcy court acknowledged that San Benito is bound by its CBAs to "contribute 1.3% of each employee's annual compensation each year." A00721. The court found, however, that none of the three figures proffered by San Benito "represents the 1.3% mandatory contribution." A00721. The bankruptcy court analyzed California law to conclude that, in general, "an actuary's recommendation for funding does not represent a legal obligation." A00723. Turning to the record, the court noted "[t]he line between the 1.3% required contribution and the actuarially determined contribution was not clarified at trial." A00725. It also explained why San Benito's proffered numbers did not add up in light of the evidence that was introduced about its payroll figures. A00725. The order concluded on this point by stating that there was no evidence whatsoever on what was the actual contribution figure required by the CBAs and that there was no presently enforceable obligation to contribute what an actuary prognosticates that amount may be. A00727.

In short, the bankruptcy court concluded that the proffered numbers did not suffice to meet the District's burden of showing the amount of a presently enforceable obligation. Consequently, San Benito had not demonstrated that the pension funding obligation was a presently enforceable debt it was not paying or could not pay. A00727.

The District does not challenge the bankruptcy court's factual findings.[3] It instead takes issue with the bankruptcy court's exclusion of its annual pension funding obligation from the insolvency analysis as legal error on the ground that its proffered actuarially determined numbers did suffice to show a presently enforceable, and so statutorily relevant, debt. Dkt. No. 8 at 23-24. San Benito advances several arguments to that end. *Id.* at 24-35.

None of the arguments are well taken. San Benito's main contention is that "the California Constitution and United States Constitution imply a contractual obligation between [San Benito]

---

[3] The District says in passing the pension funding obligation amount is "undisputed," pointing to the "actuarially determined amount ranging from $3 million to $4.05 million." Dkt. No. 8 at 39. This statement, asserted as fiat and unaccompanied by developed argument, is inconsistent with the bankruptcy court's findings and does not show those findings are clearly erroneous.

4

and its employees that mandate annual pension contributions that maintain an actuarially sound pension." Dkt. No. 8 at 28-29. That obligation is said to entail "a specific right . . . that provides for annual contributions to fund current benefits and underfunding liabilities."[4] *Id.* at 27. The District is right that, under California law, public-employees' pension fund plans "create *implied* contractual rights that are protected against legislative impairment" by the constitutional contract clauses. *Alameda Cnty. Deputy Sheriff's Ass'n v. Alameda Cnty. Employees' Retirement Ass'n* (*Alameda Cnty.*), 9 Cal. 5th 1032, 1076 (2020) (emphasis in original). The District is also right that the line of California cases establishing these principles demonstrates those rights may be presently enforceable by a plan beneficiary prior to retirement. *See id.* at 1076-84 (discussing cases). San Benito's further suggestion the constitutional contract clauses would deem such rights impaired if it did not make "annual pension contributions that maintain an actuarially sound pension" is without basis. Dkt. No. 8 at 29.

In *Board of Administration v. Wilson*, the California Court of Appeals held that "state employees under PERS have a contractual right to an actuarially sound retirement system." 52 Cal. App. 4th 1109, 1135 (1997); *see Valdes v. Cory*, 139 Cal. App. 3d 773, 785-86 (1983). The court determined that legislative amendments, which significantly altered the payment schedule for the pension fund, impaired that right because the record showed the amendments had "significant detrimental effects on the financial future" of the fund. *Wilson*, 52 Cal. App. 4th at 1141-44. The implied contractual right to regular contributions maintaining an actuarially sound pension did not, contrary to San Benito's suggestion, flow from either the U.S. or California Constitution. Both *Wilson* and *Valdes* made clear that the contractual right they identified to an actuarially sound pension, with contributions to be made at a particular frequency, arose from the text, structure, and legislative history of the specific statute creating the pension. *See Wilson*, 52 Cal. App. 4th at 1140 ("[Our] review of the present law, its statutory antecedents and the

---

[4] The bankruptcy court expressly noted that San Benito "[did] not argue that either federal or state law mandates a minimum contribution rate." A00721. Setting aside issues of waiver, the Court addresses the argument because it presents a purely legal question. *See, e.g.*, *Gregor v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006).

legislative history dispel any doubt that the Legislature intended to create and maintain the PERS on a sound actuarial basis." (quoting *Valdes*, 139 Cal. App. 3d at 785-86)). The constitutional contract clauses simply prohibited legislative impairment of that contractual right, which had been previously established by the statute.

There is no evidence or argument in this case to the effect that the pension fund was created pursuant to the statute considered by *Wilson* and *Valdes* or one materially similar. Nor does San Benito cite authority that California law would imply those same contractual obligations for all public-employee pensions, regardless of the plan's actual terms. San Benito also cites no authority suggesting the federal Constitution affords different or greater rights. This challenge consequently supplies no basis for disturbing the bankruptcy court's conclusion that the actuarially determined figures San Benito proffered were not presently enforceable amounts and so not statutorily relevant to the insolvency inquiry.

San Benito next contends the California Constitution "imposes fiduciary obligations to public pensions."[5] Dkt. No. 8 at 29. Relying on a single California Court of Appeal decision, *O'Neal v. Stanislaus Cnty. Employee's Retirement Ass'n*, 8 Cal. App. 5th 1184 (2017), it says its fiduciary obligations include the present obligation to "make annual, actuarially determined contributions to a pension necessary to fund future benefits regardless of whether the benefits are presently due." Dkt. No. 8 at 30. That case imposes no such duty. *O'Neal* says only that the evidence could permit a factfinder to conclude that the relevant decisionmakers, in making otherwise lawful decisions to reduce employer annual contributions, breached their duty of loyalty by placing employer interests above those of the pension beneficiaries. 8 Cal. App. 5th at 1218, 1221. Insofar as San Benito suggests in a reply brief that there is evidence supporting a finding that it breached its fiduciary duties, and so the amounts of its annual contributions could be presently enforceable, Dkt. No. 18 at 8-9, the argument was not made in its opening brief and is deemed waived. *See Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129-30 (9th Cir. 2012).

---

[5] This argument is similarly assumed to be properly presented on appeal.

6

        The District's argument that the bankruptcy court failed to distinguish between unfunded actuarial accrued liability and annual contribution obligations, Dkt. No. 8 at 31-33, rests on inapposite legal principles and misapprehensions of that which the court held. *See United States v. Ruiz-Apolonio*, 657 F.3d 907, 920 (9th Cir. 2011) ("The district court is not required to provide a detailed explanation as to each of its reasons for rejecting every argument made by counsel."). Nor do *In re City of Chester*, 649 B.R. 633, 639 n.3 (Bankr. E.D. Pa. 2023), and *In re City of Detroit, Mich.*, 504 B.R. 191, 208 (Bankr. E.D. Mich. 2013), help San Benito, as those decisions involved state law requiring actuarially determined contributions or evidence of the actual delinquent contribution amounts.

## IV.    ADMISSIBILITY OF HURLEY TESTIMONY

        San Benito objects to the admission of testimony by the Objectors' expert, Melvin Hurley. Dkt. No. 8 at 52-55. The admission of evidence is reviewed for abuse of discretion. *See In re Kim*, 130 F.3d 863, 865 (9th Cir. 1997).

        The District says that it was error to permit Hurley to testify "whether financial documents . . . are more reliable *in the context of a chapter 9 insolvency analysis*" where Hurley was neither qualified nor "presented as an expert in chapter 9 insolvency." Dkt. No. 8 at 53 (emphasis in original). The contention is premised on the notion that "insolvent," as used elsewhere in the Bankruptcy Code, refers to "balance-sheet insolvency," but not so for purposes of Chapter 9. *Id.* The bankruptcy court determined that Hurley's opinions were not based on what San Benito dubs a balance-sheet analysis, and San Benito does not challenge that finding. A00754-55. The District says that the internal financial statements, to which Hurley looked for his opinions, were based on one accounting methodology but the prospective-insolvency analysis requires consideration of a different accounting methodology. *See* Dkt. No. 8 at 53; Dkt. No. 18 at 18. This ignores the bankruptcy court's crediting of testimony from San Benito's officers stating that the data in those financial statements were "an accurate representation of how much money [San Benito] has to pay its bills." A00733. There was no abuse of discretion, as that evidence shows that disputes with Hurley's reliance on data based on one accepted accounting methodology versus another go to the weight of his testimony, not admissibility. *See Hyer v. City and Cnty. of*

7

1    *Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) ("The [trial] court has 'broad discretion' in
2    rendering such evidentiary rulings." (citation omitted)).
3          Nor did the bankruptcy court abuse its discretion in admitting Hurley's opinions about the
4    accuracy of the District's proffered expert's financial forecasts "[w]ithout considering the
5    underlying data supporting the projections." Dkt. No. 8 at 54. To be admissible an expert's
6    opinions must be "based on sufficient facts or data." Fed. R. Ev. 702(b). Hurley relied on San
7    Benito's internal financial statements, explained why he thought the information contained therein
8    was reliable, and offered an opinion based on his experience and analysis of the statements that
9    there was something wrong with San Benito's expert's projections, given the differences in dollar
10   amount and deficiencies he identified in methodology. A00753, 00755; A001380-84. *See Klein*
11   *v. Meta Platforms, Inc.*, --- F. Supp. 3d ---, 2025 WL 489871, at *8 (N.D. Cal. Feb. 13, 2025)
12   ("An expert's job is to consider existing data and make inferences, hypotheses, and
13   extrapolations."). The bankruptcy court did not abuse its discretion in finding his conclusions
14   were based on sufficient facts. *See Hyer*, 118 F.4th at 1055; *see also FTC v. BurnLounge, Inc.*,
15   753 F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we
16   are mindful that there is less danger that a trial court will be 'unduly impressed by the expert's
17   testimony or opinion' in a bench trial." (citation omitted)). That Hurley did not consider all the
18   potentially relevant data goes to weight, not admissibility. *See Alaska Rent-A-Car, Inc. v. Avis*
19   *Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (noting that courts should "not exclude
20   opinions merely because they are impeachable").

21   **V.    PROSPECTIVE INSOLVENCY**
22         The District says the bankruptcy court's prospective-insolvency determination was
23   defective in several respects, but its arguments either misconstrue the bankruptcy court's ruling or
24   fail to grapple with the record and the trial court's factual findings.
25         San Benito first contends the bankruptcy court improperly grafted onto the prospective-
26   insolvency analysis a novel and unduly stringent standard originating from the court's
27   interpretation of Generally Accepted Accounting Principles (GAAP). Dkt. No. 8 at 41-42. The
28   statement on which San Benito focuses, *see* A00731, is simply the court's unobjectionable

observation that the party bearing the burden of proving insolvency must also show that the evidence offered to that end is reliable and not bogus. This is inherent in the preponderance-of-the-evidence standard.

The District next faults the bankruptcy court for "requiring [San Benito] to produce projections that matched actual historical results," which was the product of the court's assertedly misplaced "efforts to reconcile . . . accrual-based historical financial records with cash-based projections." Dkt. No. 8 at 45-48. Again, the bankruptcy court did no such thing.

The court began by observing that the accrual-based internal financial statements and the cash-based expert forecasts both purported to show "ending cash balances for each month," the former on a historical basis and the latter on a predictive basis. A00730-31. After noting that GAAP-based financial statements are "designed to create financial reports that are accurate and reliable," A00733; A00752-53, the court then emphasized the substantial differences between the statements and forecasts for months between December 2022 and April 2023. A00732. Though acknowledging that the financial statements were accrual-based and operated on slightly different timing, A00731-32, the bankruptcy court credited the District's chief financial officer's testimony that the "cash balances generated by [San Benito's] financial reporting system . . . were 'an accurate representation of how much money [San Benito] has to pay its bills' in any given month." A00733 (quoting trial testimony). The bankruptcy court also credited Hurley's testimony that "it is 'extremely common' to rely on monthly financial reports for operational decisions and is generally an indicator of cash available to pay bills." A00734. Finally, the court placed heavy emphasis on how the cash-based expert forecast "consistently report[ed] cash balances that are far below the figures in the monthly financial reports." A00734. Based on this evidence, the bankruptcy court concluded the cash-based forecasts simply were not reliable indicators of San Benito's end-of-month balances and so did not "present[] a sound basis for analyzing the District's cash flow." A00735.

Far from requiring proof the cash-based forecasts were accurate to the accrual-based financial statements, the bankruptcy court required no more than an evidentiary basis that the forecasts were *at all* accurate reflections of San Benito's real-world cash situation in light of the

9

1  evidence that the financial reports contained "accurate representation[s]" of the District's cash
2  balances. A00733-34. The bankruptcy court did not err in requiring evidence supportably
3  showing that San Benito's proffered cash-based forecasts amounted to more than sending a
4  messenger to Delphi for an oracle. *See, e.g.*, *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1226 (9th
5  Cir. 2021) ("[I]t is the job of the fact finder . . . to determine which source is more credible and
6  reliable." (citation omitted)).

7      San Benito highlights evidence that it believes corroborates the cash-based forecasts'
8  reliability. Dkt. No. 8 at 43-44, 47. But that evidence does not show the bankruptcy judge's view
9  of the record was not also possible. *See In re Marshall*, 721 F.3d at 1039; *Rudolph v. Ponderosa*
10 *Village Apts.*, , 688 (9th Cir. 2008) (unpublished) ("If the trial judge's findings are based on his
11 decision to credit the testimony of certain witnesses . . . 'that finding, if not internally inconsistent,
12 can virtually never be clear error.'" (citation omitted)).

13     The District's assertion that the bankruptcy court erred by "unduly limit[ing] its analysis
14 . . . by focusing on whether 'two sources' of financial data . . . satisfied [San Benito's] burden,"
15 Dkt. No. 8 at 50-51, is not well taken. In its post-trial brief, San Benito almost exclusively relied
16 on those same "two sources of financial data" to argue prospective insolvency. A00700-02. The
17 Court struggles to see how the bankruptcy court erred by focusing on the evidence on which San
18 Benito hung its proverbial hat instead of other evidence the District itself did not cite in support of
19 its position. San Benito attempts to cast its remaining arguments as questions of law, Dkt. No. 8 at
20 49-51, but those averments boil down to saying the bankruptcy court should have weighed the
21 evidence differently. Given the fact-bound nature of the inquiry, *see Bufkin v. Collins*, 604 U.S.
22 ---, 145 S.Ct. 728, 739 (2025), the Court cannot conclude the bankruptcy court clearly erred.

23     **AFFIRMED**.

25 Dated: March 21, 2025

_____
JAMES DONATO
United States District Judge